J-A21009-22

2023 PA SUPER 39

| | | |
|---|---|---|
| JAMES M. FRANCIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LCP NORTH THIRD, LLC | : | |
| | : | |
| Appellant | : | No. 665 EDA 2022 |

Appeal from the Order Entered January 31, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180702329

| | | |
|---|---|---|
| JAMES M. FRANCIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LCP NORTH THIRD, LLC | : | |
| | : | |
| Appellant | : | No. 666 EDA 2022 |

Appeal from the Judgment Entered January 31, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  180702329

BEFORE:  LAZARUS, J., MURRAY, J., and McCAFFERY, J.

OPINION BY LAZARUS, J.:                          **FILED MARCH 14, 2023**

LCP North Third, LLC (LCP) appeals from the judgment,[1] entered in the

Court of Common Pleas of Philadelphia County, following a non-jury trial.  On

---

[1] LCP filed notices of appeal from both the January 31, 2022 order granting attorneys' fees to Francis (665 EDA 2022) and the judgment entered on February 1, 2022 (666 EDA 2022).  Where judgment is entered in the underlying litigation before the trial court rules on a motion for counsel fees, the order on counsel fees is appealable when entered without the need for

*(Footnote Continued Next Page)*

appeal, LCP challenges the trial court's denial of its post-trial motion for judgment notwithstanding the verdict (JNOV) and a new trial, and the award of attorneys' fees to Appellee James M. Francis. After review, we affirm.

The gravamen of this complaint involves the Second Omnibus Amendment[2] of a Settlement Agreement (Second Amendment) between LCP and Francis. LCP, managed by Alan Leavitt, is a corporation that administers partnerships and purchases loans. Pursuant to the Second Amendment, LCP extended an option to Francis for the purchase of property located at 115-17 North Third Street, Philadelphia, Pennsylvania 19106 (Property). The issue on appeal is whether LCP stalled in completing construction at the Property with the intention of defeating Francis' ability to exercise his purchase option.

For context, Francis, through an entity titled One North Third (ONT),[3] purchased the Property in 2004. N.T. Trial, 9/20/21, at 32. Following ONT's default on two construction loans, LCP purchased loan documents related to the Property and the Property was listed for sheriff sale. *Id.* at 38, 43-45; *id.*, 9/21/21, at 78. Thereafter, Francis, on behalf of ONT, and LCP entered

_____

entry of judgment on it. *See Carmen Enterprises, Inc. v. Murpenter*, LLC, 185 A.3d 380, 389 (Pa. Super. 2018), citing *Miller Elec. Co. v. DeWeese*, 918 A.2d 114, 114 (Pa. 2007). Here, however, the court ruled on Francis' attorneys' fee request prior to the entry of judgment. The attorneys' fee award was therefore included in the judgment and, as such, the appeal at docket number 665 EDA 2022 is duplicative and is hereby quashed.

[2] A First Amendment had previously been executed involving construction funds, but it is not germane to this case.

[3] At all relevant times, Francis was the owner and manager of ONT.

into a Settlement Agreement,[4,5] pursuant to which LCP would purchase the Property at sheriff's sale, Francis would complete work at the Property, and following LCP's purchase of the Property, Francis would make monthly rent payments to LCP. Francis was also given an option to purchase the Property, which could be executed any time after the Property was transferred to another party, including LCP, and prior to February 17, 2019. *Id.*, 9/20/21, at 47; *id.*, 9/22/21, at 153. LCP purchased the Property at sheriff's sale in August 2017. *Id.* at 153; Exhibit D-6 (Deed to Property).

The following two events prompted discussions regarding an amendment to the Settlement Agreement. First, on April 21, 2017, the Department of License and Inspection (L&I) of the City of Philadelphia issued a stop-work order on the Property because, *inter alia*, the sprinkler and fire suppression systems were not certified. *Id.*, 9/20/21, at 54.[6] Francis testified that following a dispute between him and Benjamin Magness, the plumber and

---

[4] Exhibit P-2 (Settlement Agreement).

[5] Francis, through ONT, owned the Property when the Settlement Agreement was executed.

[6] The stop-work order also cited the need to obtain a permit for installation of heating and air-conditioning systems. Additionally, the building permit was revoked because it was either issued in error or a condition of the permit had been violated. Further, the plumbing permit was revoked because it was issued on the basis of false statements or misrepresentations of fact. The zoning and/or use registration permit was also revoked because it was issued in error. Finally, an inspection at the Property showed that the certified plans did not comply with the Philadelphia Building Construction and Occupancy Code. *See* Exhibit P-8 (Notice of Violations from City of Philadelphia).

sprinkler system contractor, Magness refused to return to the project to certify his work. *Id.* at 51, 91. Second, Francis had defaulted on monthly rent payments to LCP. On November 30, 2017, LCP notified Francis that he owed $20,500.00 in rent to LCP and, thus, was in default under the Settlement Agreement. *Id.*, 9/22/21, at 155; *see* Exhibit D-30 (e-mail notification of default to Francis).

Following these events, LCP and Francis discussed an amendment to the Settlement Agreement, pursuant to which LCP would manage construction at the Property. Francis testified that "[LCP] said that [its] people knew [] Magness" and "since [LCP's] people are familiar with [] Magness, [LCP and I] came to an arrangement that [LCP] would finish the project[.]" *Id.* at 85. Francis and LCP also discussed the need for LCP to obtain a certificate of occupancy (CO). *Id.*, 9/20/21, at 97. Francis testified that LCP "balked" at the need to obtain a CO and Francis conceded that he was prepared to purchase the Property when it was "substantially complete." *Id.*

The parties executed the Second Amendment on February 14, 2018. Exhibit P-46. Pursuant to the Second Amendment, LCP would complete construction of the Property, Francis would provide LCP with contact information for the contractors and consultants working on the Property,[7] and

---

[7] Francis testified that he provided LCP with all information requested on February 2, 2017, but that LCP did not use these contractors. N.T. Trial, 9/21/21, at 162; *id.* 9/23/21, at 45 (Leavitt testifying "[Francis] gave us a list of contractors he had dealt with, but [due to] the conditions in the building, the work was C minus at best.").

Francis had either 90 days from the date LCP received the CO for the Property, or, until June 30, 2018, whichever occurred first, to either exercise or assign his option to another buyer. *Id.*, 9/20/21, 132; **see also** Exhibit P-3 (Second Amendment). Additionally, Section 6 of the Second Amendment states: "The parties acknowledge that LCP desires to complete the construction of the property as promptly as possible, and [Francis] shall not hinder or delay such prompt completion." **See** Exhibit P-46 (Second Amendment).

Leavitt testified that LCP did not bind itself to substantially complete the property. N.T. Trial, 9/23/21, at 35 (Leavitt testifying, "We said we would diligently work, but we knew there was a stop[-]work order there. We knew the first order of business was getting it removed."); *id.* at 34 (Leavitt testifying, "We expected that we would be able to get the project back on track, at least get the sprinkler [] guys, fire suppression guys back in based on our relationship."); *id.* at 34-35 (Leavitt testifying, "[Y]ou can't say you'll get a CO unless you know what was in the walls. We were not there. We made it very clear we weren't going to commit to it.").

Leavitt also testified regarding construction at the Property. The property needed a new roof, which could not be completed until there were appropriate weather conditions. *Id.* at 44-45; *id.*, 9/21/21, at 173 (Leavitt testifying, "We had a foot of water in the building leaking from the roof and the building department would only let one contractor in at a time, so it had to be the roofer first."). Leavitt also testified, "The only work we did was work

that was permitted by the building department, L&I [], and it was almost all related to the sprinkler." *Id.* at 156.

On June 29, 2018, Francis exercised his option and scheduled closing for July 26, 2018. *Id.*, 9/22/21, at 171; *see* Exhibit P-63. LCP sent Francis an updated option price calculation,[8] which indicated that as of July 10, 2018, the total amount of money Leavitt spent on construction, including pending liabilities, was $86,520.00.[9] *Id.*, 9/20/21, at 185-86. On July 20, 2018, Francis received a City of Philadelphia certification showing that the stop-work violations had not been removed. *Id.* at 181; *see* Exhibit P-66.

Francis testified that he exercised the option to keep the deal "alive" and that "[LCP] could not fulfill that option." *Id.*, 9/20/21, at 182. Francis also testified that on July 24, 2018, Francis informed LCP that closing was not going to occur because LCP did not complete construction at the property and Francis did not receive the "seller documents" he previously requested. *Id.* at 183-84; *see* Exhibit P-65 (July 11, 2019 e-mail from Francis to LCP requesting seller documents, including building drawings, L&I permits and approvals, insurance certificates, schedule for completion of work,

---

[8] Pursuant to the Second Amendment, the purchase price of the option was $4,311,835.00 plus construction expenses. *Id.*, 10/20/21, at 133.

[9] The updated option price indicated that $23,810.00 was paid to "Roofer" and $150.00 was paid for "Use Registration Change" to L&I. The remaining $62,560.00 was for pending liabilities to be paid within 30 days and included "HVAC – Roof (Completed)," "Sprinkler & Unit Plumbing," "Sprinkler – Electrician," and "Fire Alarm." *See* Exhibit P-64 and P-65.

liens/liabilities, and applications for COs). LCP attended the scheduled closing and Francis did not. N.T. Trial, 9/23/21, at 54.

In July 2018, Francis sued LCP for breach of contract. On September 20, 2021, the case proceeded to a non-jury trial before the Honorable Leon Tucker. The trial court found that LCP breached its duty of good faith and fair dealing and awarded Francis $966,126.00 in damages. By separate order, the trial court awarded Francis $229,482.56 in attorneys' fees and costs. LCP's post-trial requests for JNOV and a new trial were denied. This timely appeal followed. Both the trial court and LCP have complied with Pa.R.A.P. 1925. LCP raises the following issues for review:

1. Whether the trial court erred in failing to grant LCP's request for JNOV where Francis failed to prove: (i) an express or implied contractual duty that required LCP to complete construction within a certain timeframe; (ii) that LCP breached any contractual duty in the face of undisputed evidence establishing that delays were caused by a "stop[-] work" order and/or weather and not by LCP's conduct; (iii) that Francis, as [the] purported non-breaching party, fulfilled *his obligations* under the contract by establishing that he was ready, willing[,] and able to "close" on the Property; and (iv) damages, in light of the undisputed valuation evidence and evidence regarding the staggering substantial construction costs that remained.

2. Whether the trial court erred in awarding attorneys' fees where [Francis] failed to prove all elements of his breach of contract claim, and thus, cannot properly be considered a "prevailing party" under the [parties] agreement?

3. Whether [Francis] erred in entering judgment in the amount of the verdict and attorneys' fee award after the attorneys' fee award had been separately entered by a different [o]rder and judgment on the award should not have been entered twice on the same award?

Appellant's Brief, at 18 (emphasis in original).

LCP first alleges that Francis failed to prove breach of contract and, thus, LCP is entitled to JNOV, or in the alternative, a new trial. When reviewing a motion for JNOV the evidence must be viewed in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact. *Fanning v. Davne*, 795 A.2d 388, 392 (Pa. Super. 2002) (quotation omitted). Any conflict in the evidence must be resolved in the verdict winner's favor. *Id.* JVOV may be entered: (1) where the moving party is entitled to judgment as a matter of law, or (2) where the evidence was such that no two reasonable minds could disagree that the outcome should have been in favor of the moving party. *Id.* at 393.

On appeal of a trial court's denial of a motion for JNOV, our Court will reverse the trial court only upon a finding of an abuse of discretion or error of law that controlled the outcome of the case. *Eichman v. McKeon*, 824 A.2d 305, 311 (Pa. Super. 2003) (citation omitted). Additionally, where credibility and the weight to be accorded the evidence are at issue, this Court will not substitute its judgment for that of the fact-finder. *Id.* at 311-12 (citation omitted).

The standard of review of a trial court's grant or denial of a motion for a new trial, is, generally, whether the trial court clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. *Stevenson v. General Motors Corp.*, 521 A.2d 413, 422 (Pa. 1987). To reverse the trial court, this Court must consider all the evidence in the light most favorable to the non-moving party and conclude that the verdict

would be different if another trial were granted. ***Robertson v. Atlantic Richfield Petroleum Products Co.***, 537 A.2d 814 (Pa. Super. 1987).

LCP first argues that Francis did not prove breach of contract. "To successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." ***Hart v. Arnold***, 884 A.2d 316, 332 (Pa. Super. 2005).

Additionally, Pennsylvania courts impose a requirement of good faith in performance under a contract, termed the "doctrine of necessary implication." ***Somers v. Somers,*** 613 A.2d 1211, 1214 (Pa. Super. 1992).

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

***D.B. Van Campen Corp. V. Building and Constr. Trades Council***, 195 A.2d 134, 136-37 (Pa. Super. 1963). "The duty of 'good faith' has been defined as 'honesty in fact in the conduct or transaction concerned.'" ***Somers***, ***supra*** at 1213.

> The obligation to act in good faith in the performance of contractual duties varies somewhat with the context, and a complete catalogue of types of bad faith is impossible, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Id.* (citations omitted).

LCP's first two sub-claims allege that there was no duty to complete construction at the property and, thus, LCP did not breach any duty. Specifically, LCP contends that the contract language in Section 6 of the Second Amendment, wherein Francis and LCP acknowledge that LCP "*desires to complete the construction of the Property as promptly as possible,*" is merely precatory. Thus, LCP claims that this language does not create any duty on LCP to advance construction by a certain date, to obtain a CO, to spend a certain amount of money on construction, or to grant Francis' option extension requests. Appellant's Brief, at 25-29. Further, LCP alleges that any delays were caused by the stop-work order, rather than LCP's conduct. These claims are unavailing.

Although we agree with LCP that it was not expressly required to complete the individual prior-mentioned tasks, the record confirms the trial court's determination that LCP's *actual behavior* demonstrated it had no intention to complete construction of the Property as promptly as possible despite the mandate to do so in Section 6, and, thus, LCP breached its duty of good faith. Trial Court Opinion, 12/3/21, at 4-5.

While Francis conceded he "was prepared to take the building when it was substantially complete []," N.T. Trial, 9/20/21, at 97, this does not obviate LCP's good faith obligation to move forward with construction. The parties disagreed regarding LCP's need to obtain a CO prior to Francis' execution of his option. However, Francis testified that the exclusion of the CO requirement

was because the parties could not control when L&I would perform inspections. *See* N.T. Trial, 9/20/21, at 97 (Francis testifying "I wanted them to have a certificate of occupancy. [LCP] balked at that, and one of the reasons was the amount of time it might take the City to [perform] their inspection."). Additionally, LCP advised Francis in an e-mail, dated January 24, 2018, that LCP was going to "work diligently to obtain a [CO]" and that Francis would have enough time to obtain financing. *See* Exhibit P-29; *see also* N.T. Trial, 9/20/21, at 98 (Francis testifying e-mail reinforced "[LCP] was going to get everything done.").

Moreover, although LCP was not required to spend a specific amount of money on construction, from the date the Second Amendment was executed, February 14, 2018, until July 10, 2018, LCP spent *only* $86,520.00 on construction, including pending liabilities. N.T. Trial, 9/21/21, at 202. Additionally, fire alarm work, which was essential to remove the stop-work order, did not begin until June 8, 2018, and payment for the same was still pending as of July 10, 2018. *Id.*, 9/23/21, at 92; *see* Exhibit P-64. Moreover, a property certification from L&I, dated July 20, 2018, shows that none of the stop-work violations had been removed. *Id.* at 182 (Francis testifying "[the July 20, 2018 City certification] had every violation that existed based on the stop[-]work order."); Exhibit D-21 (Initial Notice of Violation and Order); Exhibit P-66 (July 20, 2018 License and Inspections Certification Statement).

The record demonstrates that delays were not *only* caused by the stop-work order. LCP failed to schedule weekly phone calls with Thomas Donatucci

from Knickerbocker Properties[10] until two months after the Second Amendment was executed, *see* N.T. Trial, 9/21/21, at 175, even though Leavitt and Donatucci had scheduled weekly phone calls regarding other properties on which they were working.[11] Further, testimony regarding the fire alarm system indicates that LCP was first sent the sprinkler and fire suppression system proposal twice before it was approved, delaying the start of work on the system until June 8, 2018. *Id.*, 9/23/21, at 92. The proposal was originally sent to LCP on March 7, 2018. *Id.*, 9/21/21, at 170; *see also* Exhibit P-86.

Leavitt's testimony that he would have made a profit *only* if Francis exercised his purchase option is belied by Leavitt's conduct. *Id.*, 9/21/21, at 191 (Leavitt testifying, "I told [Francis] three times the only way I could have broken even on the job was if [Francis] exercised his option."). For example, LCP filed use permit changes in order to "maximize value" of the Property

_____

[10] Knickerbocker Properties was the general contractor at the Property. Thomas Donatucci works at Knickerbocker Properties, along with his brother, Robert Donatucci. Together they have a 4% interest in the Property but do not have any voting power or decision-making authority. N.T. Trial, 9/23/21, at 38-39.

[11] Knickerbocker Properties and Leavitt are working together on other projects, such as 248 Market St., Philadelphia, PA 19106, and have weekly calls scheduled. N.T. Trial, 9/21/21, at 174; *id.*, 9/23/21, at 38.

even though it knew L&I approval of the changes would take time and that Francis had a limited window to exercise his option.[12]  *Id.*, 9/21/21, at 177.

Further, LCP failed to grant Francis' two requests for extensions of the option execution date.  *Id.*, 9/20/21, at 175-76; *id.*, 9/21/21, at 179; *see* Exhibit P-57 (Francis requesting extension of the option contract because LCP "deliberately let the job languish to forestall [temporary COs] being issued in a timely manner").  Additionally, in an e-mail denying Francis' request for an extension, LCP stated:

> LCP may pursue or not pursue the remaining construction work at the [P]roperty as it sees fit in its sole discretion.
>
> * * *
>
> [W]hether or not the construction work at the [P]roperty is completed, and when, if ever, it is completed, is irrelevant to [Francis'] right to exercise his option under the [Second Amendment.]

Exhibit P-145.  Indeed, the record supports the trial court's determination that LCP's actual behavior confirmed that LCP had no intention of moving work forward at the Property to enable Francis to exercise his purchase option.

In light of the foregoing, the record confirms the trial court's determination that LCP breached its duty of good faith implied in the language of the Second Amendment.

---

[12] On April 24, 2018, Leavitt filed a use permit to change zoning of the Property from 12 units to 15 units. After the changes were approved, Knickerbocker Properties emailed LCP, "I think *you* made some money today."  N.T. Trial, 9/23/21, 183 (emphasis added); *see* Exhibit P-118.

LCP's third sub-claim alleges that Francis breached his duties under the contract. Specifically, LCP claims Francis was not ready, willing and able to close on the Property because Francis did not receive funding commitments in excess of the base price amount and Francis failed to attend the set closing date. Appellant's Brief, at 39. This claim is belied by the record.

The trial court determined: "[Francis] was unable to secure financing of the Property in the then[-]current condition or, alternatively, was not able to assign the option in accordance with the option agreement. [] Furthermore, [LCP] refused to give [Francis] relevant documents to confirm the status of the [Property]." Trial Court Opinion, *supra* at 8.

Indeed, Francis had been negotiating with Marcus and Millichap (M&M) regarding its purchase of the option. M&M's proposed sale price or trade price, for the Property was between $4,950,000.00 and $5,350,000.00; this information was sent to LCP on April 30, 2018. N.T. Trial, 9/21/21, at 182-84; Exhibit P-50. Leavitt acknowledged that M&M is "one of the largest real estate brokers in the country" and that Francis "was not messing around." *Id.*, 9/21/21, at 184. However, M&M and Francis did not move forward because construction at the Property was not substantially complete, and Francis was unable to provide M&M building progress information because LCP did not provide this requested information to Francis. *Id.*, 9/20/21, 167 (Francis testifying, "It's just customary, if I speak to lenders, I need to give them information[.] I need to see it also, and [LCP] refused to give that to

- 14 -

me."); Exhibit P-53 (Francis' request for documents from LCP). Due to LCP's conduct, Francis was unable to secure financing.

In light of the foregoing, the trial court's determination that Francis' inability to secure financing was due to LCP's lack of good faith compliance with the Second Amendment is supported by the record.

LCP's fourth sub-claim alleges that Francis failed to prove damages. Specifically, LCP argues William Connor, Francis' damages expert, failed to consider the valuation evidence and substantial remaining construction costs on the Property. Appellant Brief, at 42. LCP is entitled to no relief.

The trial court adopted the expert damages proffered by Reaves Lukens, Francis' expert. The trial court reasoned that Lukens' property appraisal method was consistent with the appropriate term net rentable area,[13] and was consistent with M&M's valuation, which was performed pre-litigation. Trial Court Opinion, *supra* at 10. Additionally, the trial court found LCP's expert's valuation analysis flawed due to his use of the lowest comparable properties sold in the 19106 ZIP code. Lukens determined that the Property was valued at $5,600,000.00. N.T. Trial, 9/22/21, at 116.

---

[13] The useable square footage of a space is the total area unique to a tenant, whereas the net rentable square footage includes the portion of the building's common spaces also available a tenant. The building's gross square footage is the total square footage of a building. **See** https://aquilacommercial.com/learning-center/rentable-vs-usable-square-footage-whats-difference/ (last accessed on 12/22/22). The rentable area is the amount of space you can collect rent on or sell. **Id.**

The trial court also adopted the analysis of William Connor, Francis' expert, who determined that the remaining construction costs would be $322,039.00. *Id.* Connor considered the cost to complete each individual unit, the one office unit, and various building systems, including the HVAC and fire alarm systems. N.T. Trial, 9/22/21, at 19, 27. Connor also considered the cost to complete roofing work, the storefront, and intercom system. *Id.* at 27-28.

Francis is entitled to the profits he would have received if the Second Amendment was not breached. *See Oelschlegel v. Mut. Real Estate Inv. Trust*, 633 A.2d 181, 184 (Pa. Super. 1993) ("The central principal of the law regarding contractual damages is that the non-breaching party should be placed in the position he or she would have been in absent the breach."). The appraised value of the property, as per Lukens, was $5,600,000.00 as of June 30, 2018. *Id.*, 9/22/21, at 116. Pursuant to the Second Amendment, the total option price ($4,633,874.00) was the base option price ($4,311,835.00) plus construction expenses ($322,039.00). *Id.*, 10/20/21, at 133; *id.*, 9/22/21, at 31. Damages are calculated by subtracting the total option price ($4,633,874.00) from the appraised value of the Property ($5,600,000.00), and, thus, the trial court did not abuse its discretion in ordering $966,126.00 in damages. Trial Court Opinion, *supra* at 11; Findings [and Order], 12/3/2021.

Viewing all of the evidence, in the light most favorable to Francis, LCP is not entitled to a JNOV nor is it entitled to a new trial. ***Davne***, ***supra***; ***General Motors Corp***, ***supra***.

In its second issue, LCP claims that Francis is not entitled to attorneys' fees because there was no breach of contract and no breach of an implied duty of good faith imposed by the contract. Appellant's Brief, at 44. This argument is meritless. Francis is the prevailing party, and the parties included a fee-shifting agreement in Section 17 of the Settlement Agreement,[14] to which they also stipulated in court. ***See*** N.T. Trial, 9/20/21, at 26. ***Mullen v. Kutz***, 985 A.2d 769, 776-77 (Pa. Super. 2009) (parties may contract to provide for breaching party to pay prevailing party's attorneys' fees arising from actions contractual damages). ***See also Bert Co. v. Turk***, 257 A.3d 93, 117 (Pa. Super. 2021) (fee-shifting agreements include attorneys' fees arising from actions for contractual damages).

In its third issue, LCP argues that under ***Samuel-Bassett v. Kia Motors America, Inc.***, 34 A.3d 1 (Pa. 2011), the attorneys' fees award is

_____

[14] The Second Amendment states:

> 17. Attorney's Fees in the Event of Breach of this Agreement. If an action, suit or legal proceeding is brought by any Party to enforce of redress a breach of this Agreement, in addition to all other relief awarded by a court of competent jurisdiction, the substantially prevailing Party shall be entitled to an award of reasonable counsel fees and costs incurred in connection with such matter.

Exhibit P-46 (Second Amendment, Section 17).

considered ancillary and, thus, should not have been included in the judgment that was entered after post-trial motions were decided. This argument is meritless.

In **Kia Motors America**, our Supreme Court determined that the trial court retained jurisdiction to order attorneys' fees reasoning that "a petition for attorneys' fees is an ancillary matter, which the trial court retains authority to decide after an entry of judgment on the verdict." **Id.** at 48. **Kia Motors America** focuses on the trial court's jurisdiction to order attorneys' fees following the entry of judgment once an appeal is filed, **id.**, but does not stand for the proposition that attorneys' fees **cannot** be reduced to judgment.

Finally, LCP claims that the Prothonotary exceeded the authority permitted under the Pennsylvania Rules of Civil Procedure where it entered a judgment in excess of the verdict, and, thus, the judgment should be stricken as void *ab inito.* LCP is entitled to no relief.

LCP cites to **Mother's Restaurant, Inc. v. Krystkiewicz**, 861 A.2d 327, 337 (Pa. Super. 2004)[15] for the proposition that a claim that the

---

[15] In **Mother's Restaurant**, the prothonotary exceeded its authority where it entered a default judgment on behalf of the plaintiff after the defendant failed to respond to the plaintiff's amended complaint within a timely fashion. The Court reasoned that the plaintiff's amended complaint did not contain a notice to defend as required by Pa.R.C.P. 1511, and, thus, the defendant had no obligation to respond pursuant to Pa.R.C.P. 1026. Accordingly, the prothonotary had no authority to enter judgment and the judgment was void *ab inito*. **See** Rule 1511(a) ("The prothonotary, on praecipe of the plaintiff, shall enter a judgment by default against the defendant for failure to plead within the required time to a complaint which **contains a notice to defend**. *(Footnote Continued Next Page)*

prothonotary exceeded its authority to enter judgment can be raised for the first time on appeal because the entry of judgment is void *ab initio*. Although we agree with this proposition, here, the Prothonotary did not exceed its authority. We find **Gleit v. Nguyen**, 199 A.3d 1240 (Pa. Super. 2018) instructive. In **Gleit**, this Court determined that the Prothonotary lacked authority to enter a contempt judgment because there was no final judicial determination of the contemnor's liability. Specifically, although the court ordered sanctions in the amount of $1,000 per day against the contemnor, there was no evidence of record to support the number of days she remained in contempt. **Id.** at 1249.

Instantly, the court entered an order on December 3, 2021, awarding $966,126.00 in damages and finding that Francis was entitled to seek attorney's fees and costs as the prevailing party pursuant to the agreement in the Second Amendment. Findings, 12/3/2021. Additionally, on January 28, 2022, the court entered an order granting Francis $229,482.56 in attorney's fees. **See** Trial Court Order, 1/28/22. Subsequently, on February 1, 2022, Francis filed a praecipe to enter judgment, which included the award of damages and attorneys' fees previously determined by the court. Here,

---

In all other cases of default or of admission the judgment shall be entered by the court") (emphasis added); **see** Rule 1026(a) ("no pleading need be filed unless the preceding pleading contains a notice to defend or is endorsed with a notice to plead").

- 19 -

unlike in *Gleit*, a final determination of liability was ordered and, thus, the Prothonotary did not exceed its authority.

Order and judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2023