J-A24044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PHEASANT RIDGE DEVELOPMENT CORP., JAMES H. SEITZ, II, HEIDI L. SEITZ, BUSHKILL PRESERVE, LLC AND STONE GATE REAL ESTATE, LLC AND JIM SEITZ CONSTRUCTION CO., INC. | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | No. 2356 EDA 2023 |
| FULTON FINANCIAL CORPORATION AND FULTON BANK, N.A. | : : : : : | |
| APPEAL OF: BUSHKILL PRESERVE, LLC AND STONE GATE REAL ESTATE, LLC | : : : | |

Appeal from the Judgment Entered August 30, 2023
In the Court of Common Pleas of Northampton County Civil Division at
No(s): C-48-CV-2018-04528

BEFORE: LAZARUS, P.J., KING, J., and LANE, J.

MEMORANDUM BY LANE, J.:							**FILED APRIL 1, 2025**

Bushkill Preserve, LLC ("Bushkill") and Stone Gate Real Estate, LLC ("Stone Gate") (collectively, the "Borrowers") appeal from the judgment entered following in favor of Fulton Bank, N.A. ("Fulton Bank") and Fulton Financial Corporation ("FFC") (collectively, the "Bank") in the amount of $7,741,539.53.  We affirm.

This litigation arises from three construction loans (the "Loans") that the Bank[1] issued to the Borrowers in 2006 for the construction of a 135-unit manufactured-home community (the "Project") for individuals fifty-five years of age or older in Forks Township, Northampton County. Business partners James H. Seitz, II ("Seitz"), and Craig A. Dally ("Judge Dally") formed the Borrowers to undertake the Project, and the first home sale occurred in February 2008. Following an economic downturn, the Project stalled, and the Borrowers had sold only one-third of the 135 units by April 2017. That same month, the Bank notified the Borrowers that the Loans were in default based on real estate tax delinquencies. In September 2017, the Bank made its first demand for the Borrowers to pay all amounts due under the Loans.

On May 23, 2018, the Borrowers commenced the underlying action by filing a complaint against the Bank, asserting claims sounding in breach of contract, breach of duty of good faith and fair dealing, and breach of fiduciary duty.[2] The Bank filed an answer with new matter and counterclaims. In its

---

[1] The Loans were issued by Fulton Bank's predecessor-in-interest, Lafayette Ambassador Bank ("Lafayette"). In 2019, Lafayette merged into Fulton Bank, with Fulton Bank assuming all of Lafayette's liabilities. Fulton Bank, like its predecessor, Lafayette, is a wholly owned subsidiary of FFC. While the Borrowers initially named Lafayette as a defendant in this action, Fulton Bank was substituted as a party and the caption was amended accordingly.

[2] In addition to the Borrowers, the complaint also identified Seitz, Heidi L. Seitz, Jim Seitz Construction Co., Inc., and Pheasant Ridge Development Corp. (collectively, the "Guarantor Plaintiffs") as plaintiffs. By an order sustaining in part the Bank's preliminary objections, the trial court dismissed the complaint as to the Guarantor Plaintiffs.

counterclaims, the Bank asserted one count of breach of contract against Bushkill and two counts of breach of contract against Stone Gate, related to the three Loans associated with the Project.

The Bank filed a motion for recusal of the entire Northampton County bench based on the personal involvement in the litigation of Judge Dally, who assumed the bench of that court in 2010. Upon receipt of the motion, the full court *sua sponte* recused itself and assigned the Honorable Robert J. Shenkin, then a sitting judge on the Court of Common Pleas of Chester County, to preside over the case.

The Bank filed a motion to strike the Borrowers' demand for a jury trial. The Bank cited more than a dozen instances in the documents that evidenced the Loans (the "Loan Documents"), in which the Borrowers waived their jury trial right. Following briefing and oral argument, the trial court denied the motion to strike.

The Bank filed a timely motion for reconsideration of the denial of its motion to strike the jury trial demand. The trial court granted the motion for reconsideration and vacated the order denying the motion to strike, permitting further briefing on the issue. After considering the additional briefing, the trial court granted the motion to strike.

This matter proceeded to a six-day bench trial before Judge Shenkin in October 2022. As the trial court and the parties recognized, there was little dispute of the facts of this case. Seitz and Judge Dally were frequent partners in real estate development and long-time customers of the Bank prior to

undertaking the Project in 2006. Judge Dally served on the Board of Directors of Fulton Bank and FFC at the time of the Loans' originations.[3] Judge Dally also served as counsel to the Borrowers in connection with the closing of the Loans. Peter Snik ("Snik"), the Bank's Senior Vice President, originated the Loans, and Ann Marie Osika ("Osika"), Vice President of Commercial Real Estate Lending at the Bank, served as the relationship manager for the Loans.

The Borrowers obtained three secured Loans from the Bank: (1) a land acquisition and site improvement line of credit to Bushkill in the amount of $6,988,500 (the "Bushkill Line of Credit"); (2) a $715,705 loan to Stone Gate to purchase the existing five model homes in a neighboring community (the "Stone Gate Model Home Loan"); and (3) a $1,400,000 revolving line of credit to Stone Gate for the purchase and delivery of up to twenty manufactured homes at any given time (the "Stone Gate Line of Credit"). Each of the Loans contained the following terms: (1) the Loans were payable on demand; (2) the Borrowers were required to pay taxes when due and maintain insurance coverage at all times; (3) modification of the terms of the Loans was only permissible through a signed writing; and (4) the Bank would not waive any of its rights by any course of dealing.

Seitz and Judge Dally structured the Project as land leases, under which: Stone Gate sold the manufactured homes to the customers; but Bushkill retained ownership of the land and collected rent from the customers. The

_____

[3] Judge Dally resigned his directorships in 2015.

homes were manufactured off-site and installed when purchased by the customers. For purposes of land use approval, Seitz and Judge Dally divided the Project into two phases, involving the construction of sixty homes in the first phase and seventy-five homes in the second. However, the parties structured the Loans to provide one round of financing to complete the entire Project.

As discussed above, sales of homes in the Project were slower than anticipated due to the recession beginning in 2008. By April 2017, the Borrowers had only sold forty-six homes, leaving eighty-nine lots left unsold. The Borrowers stopped paying insurance premiums in 2010, causing the Project's property insurance coverage to lapse. Beginning in 2009, the Borrowers also repeatedly failed to timely pay the real estate taxes. Seitz and Judge Dally personally paid the real estate taxes for at least three tax years. The Bank twice paid the real estate taxes to avoid imminent tax-upset sales: first in 2011, for the 2009 taxes; and again in September 2016, for the 2014 taxes.

We now review the testimony concerning discussions of a potential restructuring of the Loans in 2015 and 2016, which was central to the issues discussed herein. Seitz testified to the following. In September 2015, during a face-to-face meeting with Osika at the Bank's offices, he requested the Bank release the remaining balance on the Bushkill Line of Credit, due to renewed interest in the Project from potential customers. *See* N.T., 10/17/22, at 57-58, 64, 179. Seitz never submitted a written request for the release of these

funds. *See id*. at 57-58, 179. Seitz understood that Osika began working on a potential restructuring of the Loans in 2015. *See id*. at 59.

Seitz testified that he again met with Osika in June 2016 to discuss the restructuring. *See id*. at 64-65. Seitz reported to Osika during this meeting that the Borrowers were short on cash and were unable to pay the real estate taxes from 2014 onward. *See id*. at 64-66. According to Seitz, Osika "was almost done with the plan" as of the date of their June meeting. *Id*. at 64.

Seitz testified that Osika "showed [him] the plan" at a subsequent September 13, 2016 meeting, which appeared on a spreadsheet entitled "Analysis 09132016" (the "Spreadsheet"). *Id*. at 65-66, 74; *see also* Exhibit P-25 at 22. Seitz understood the Spreadsheet encompassed the terms of the restructuring agreement and represented "the green light that" that restructuring would moving forward. N.T., 10/17/22, at 68. According to Seitz, the restructuring plan provided for: (1) the Bank's payment of the 2014, 2015, and 2016 real estate taxes; (2) the Bank's distribution of approximately $1,800,000 from the Bushkill Line of Credit to allow the Borrowers to complete the Project; and (3) amortization of the funds owed to the Bank at a rate of 4.5%. *See id*. at 59-60, 66-68.

On cross-examination, Seitz conceded that the Spreadsheet: (1) did not contain a heading or signature line; and (2) did not mention or address the outstanding balance on the Stone Gate Line of Credit. *See id*. at 150-53. Seitz further acknowledged that: (1) the Borrowers never received a commitment letter from the Bank reflecting a restructuring of the Loans; (2)

Osika could not personally modify the Loans, and instead approval was required from the Bank's Senior Loan Committee; and (3) the restructuring was not in fact finalized.[4] *See id*. at 146-47.

In late September 2016, Osika caused the Bank to pay the Project's 2014 real estate taxes. *See id*. at 75-76. Seitz stated that he did not ask Osika to pay the taxes, and he believed the payment to be "the implementation of [Osika's restructuring] plan." *Id*. at 75-76, 155.

On October 12, 2016, Seitz received a letter from the Bank informing him of his obligations under the terms of the Stone Gate Line of Credit to deliver $97,760.80, the proceeds from a recent home sale in the Project (the "Out-of-Trust Sale"), to the Bank. *See* Exhibit D-183; *see also* Exhibit D-42 at 1-2 (Stone Gate Line of Credit Commercial Security Agreement providing that all proceeds from home sales shall be held in trust by the Borrowers and immediately delivered to the Bank). Seitz did not deposit the proceeds from the Out-of-Trust Sale to the Bank and instead spent the money on other site-work on the Project. *See* N.T., 10/17/22, at 89-91, 159-62. Seitz testified that Osika told him that his failure to comply with the terms of the Stone Gate

_____

[4] Seitz testified as follows:

    Q.  And you're aware that the restructuring was never finalized, correct?

    A.  Yes.

N.T., 10/17/22, at 147.

Line of Credit was "okay with her" and she would add the missing funds into the restructuring agreement. *See id*. at 91, 163.

After the September 13, 2016 meeting, Seitz was "waiting patiently for [Osika] to sign the contract with the site contractor and get going" on the Project. *Id*. at 77. However, Osika resigned from the Bank in November 2016. *See id*. at 77-78.

Judge Dally testified that he resigned as a principal of the Borrowers in 2009, following his election to the trial court. *See* N.T., 10/18/22, at 19-20, 51-52. Nevertheless, Judge Dally remained a guarantor on the Project and continued to provide financial support for the Project. *See id*. at 17-21. Judge Dally's financial support for the Project included paying at least three years of real estate taxes and financing multiple "spec homes" to provide inventory for willing buyers. *See id*. at 17-18, 61.

Judge Dally testified that his understanding when he made his final spec home investment in November 2016 was that Osika "was working on a restructuring of the [L]oan[s] to allow the [P]roject to get into the second phase." *Id*. at 22. Judge Dally did not have any conversations with Osika or Snik regarding a potential restructuring. *See id*. at 64. Judge Dally acknowledged that a restructuring would have to be approved by the Bank's Senior Loan Committee for approval. *See id*. at 66-67. He had no knowledge that the Senior Loan Committee had approved the restructuring. *See id*.

Osika testified that she and Seitz began discussing a potential restructuring of the Loans in August 2015. *See id*. at 91, 96. Osika recorded

her discussions with Seitz in internal reports, which reflected that she anticipated completing a restructuring of the Loans in the summer of 2016 with an amortization rate of 4.5%. *See id*. at 92-103, 109-12. Osika testified, however, that the amortization of the debt was only possible if the Project sold 75% of the total units, which would have allowed for the land rental revenue to cover the amortization payments. *See id*. at 152-53. This condition was never satisfied. *See id*. at 153.

Osika met with Seitz in June and September 2016 to discuss restructuring the Loans. *See id*. at 103, 116. Osika stated that the Spreadsheet she showed Seitz at the September 13, 2016 meeting was "the start of" the restructuring but not a "finalized plan." *Id*. at 116, 148. Osika explained that the Spreadsheet represented "one scenario with zero testing of interest rates, absorption, [or] sensitivities." *Id*. at 120. Osika did not present a restructuring plan to the Senior Loan Committee for approval because Seitz did not provide her with all the information necessary to finalize a proposal. *See id*. at 104, 120, 126-27, 149-50.

Osika testified that she did not promise Seitz that the Loans would be restructured, nor inform him that the restructuring plan was almost complete. *See id*. at 150-51. Osika did not give Seitz approval to retain the proceeds from the Out-of-Trust Sale rather than delivering them to the Bank as required by the Stone Gate Line of Credit Loan Documents. *See id*. at 147.

Snik assumed management of the Loans upon Osika's departure from the Bank in November 2016. N.T., 10/19/22, at 28. Before Osika left the

Bank, Osika recommended the possibility of restructuring the Loans. *See id*. at 23-24, 49. However, Snik testified, he "saw no way that [a restructuring] was going to work," and he knew the Senior Loan Committee would have rejected such a proposal. *Id*. at 49-50.

When Snik discovered that the Borrowers did not deliver the proceeds from the Out-of-Trust Sale to the Bank as required by the Loan Documents, he determined that this was "basically a default." *Id*. at 47-49. When Snik inquired about the Out-of-Trust Sale, Seitz said that he did not have the money because he "had to pay other things" and Judge Dally "made it known that he wasn't going to put any more money into this [P]roject." *Id*. at 47-49.

Following his conversations with Seitz and Judge Dally, Snik "lost confidence in the credit and the people behind it." *Id*. at 49. The Bank subsequently transferred the Loans to Cathy Ashley ("Ashley"), an officer in the Special Assets Department. *See id*.

On March 1, 2017, Seitz and Judge Dally met with Ashley. *See* N.T., 10/17/22, at 79-80; N.T., 10/18/22, at 26. Seitz testified that he handed a copy of the Spreadsheet to Ashley during the meeting to initiate a conversation regarding "the plan [Osika] was working on," but Ashley handed it right back to him. *See* N.T., 10/17/22, at 81. According to Seitz and Judge Dally, Ashley stated that the Bank did not "want to do business with [the Borrowers] anymore." *Id*.; *see also* N.T., 10/18/22, at 28, 30. Seitz stated that he was "dumbfounded" as no one at the Bank had ever informed him that

the restructuring of the Loans was not moving forward. N.T., 10/17/22, at 81, 190.

On April 12, 2017, the Bank sent the Borrowers a letter notifying them that the Loans were in default for failure to pay real estate taxes (the "Default Letter"). *See* Exhibit D-250. The Bank did not demand that the Borrowers pay on the Loan's promissory notes at that time. *See id*. at 1. Instead, the Bank required that the Borrowers' take certain actions, including: (1) delivering payment of the $97,760.80 from the Out-of-Trust Sale; (2) coming to an agreement with Northampton County regarding the payment of all overdue real estate taxes; and (3) submitting a proposal to pay the Bank for advances it made on the real estate taxes. *See id*. at 2. The Default Letter set a response date of April 25, 2017, for the Borrowers to submit a plan showing their substantial progress on the issues raised in the letter. *See id*.

Seitz testified that the Borrowers did not comply with the demands set forth in the Default Letter because the Bank's requests were inconsistent with the restructuring plan Seitz formulated with Osika. *See* N.T., 10/17/22, at 95-96. The Bank did not take any further action until September 2017, when it issued its first demand that the Borrowers pay all amounts due under the Loans. *See id*. at 166-167.

Following the close of evidence, on December 27, 2022, Judge Shenkin issued a decision in favor of the Bank and against the Borrowers in the amount of $5,599,758 plus interest, attorneys' fees, and costs. Judge Shenkin retired

at the end of 2022, and the Honorable Cheryl L. Austin of the Court of Common Pleas of Montgomery County was assigned to the matter.

The Borrowers filed a motion for post-trial relief, seeking to set aside the verdict, and the Bank filed a post-trial motion for attorneys' fees and costs. Judge Austin denied the Borrowers' motion and granted the Bank's motion in part, finding that the Bank was entitled to attorneys' fees and costs but directing the Bank to submit a detailed accounting. Following receipt of the Bank's supplemental submission, Judge Austin awarded the Bank attorneys' fees and costs in the amount of $1,916,671.26.

The trial court entered judgment in favor of the Bank and against the Borrowers in the total amount of $7,741,539.53, which included Judge Shenkin's damages award, interest from the date of the verdict, and Judge Austin's fees and costs award. The Borrowers filed a timely notice of appeal. Both the Borrowers and the trial court have complied with Pa.R.A.P. 1925.

The Borrowers presents the following issues for our review:

1. Did the trial court err as a matter of law and/or abuse its discretion by failing to hold a [jury] trial and striking [the Borrowers'] demand for a jury trial, after the trial court previously (and correctly) denied [the Bank's] motion to strike the same and the Bank did not prove that the jury waiver provisions were executed knowingly, voluntarily, and intelligently?

2. Did the trial court err as a matter of law and/or abuse its discretion by failing to conclude that the Bank materially breached its contractual obligations and, instead, that the Bank was entitled to judgment on its claims for breach of contract?

3. Did the trial court err as a matter of law and/or abuse its discretion by failing to conclude that the Bank's administration

of the loans and the parties' course dealing/performance created a fiduciary obligation on the part of the Bank to the Borrowers which the Bank violated and by failing to apply the case of ***Busy Bee, Inc. v. Wachovia Bank, N.A.***, [97 CV 5078, 2006 WL 723487 (Pa. Com. Pl. Feb. 28, 2006)], ***aff'd*** 932 A.2d 248 (Pa. Super. 2007) [("***Busy Bee***")], which was decided on similar facts?

4. Did the trial court err as a matter of law and/or abuse its discretion by purporting to support the judgment with assertions that Judge Shenkin made specific findings and conclusions that are not set forth in the judgment and are factually inaccurate?

5. Did the trial court err as a matter of law and/or abuse its discretion by awarding costs and fees to the Bank where the Bank was not entitled to recover such amounts?

Borrowers' Brief at 5-6 (suggested answers and unnecessary capitalization omitted).

In their first issue, the Borrowers challenge the trial court's grant of the Bank's motion to strike the Borrowers' jury trial demand. First, the Borrowers argue that the procedure employed by the court violated motion practice rules set forth in the Pennsylvania and local rules of civil procedure. Second, the Borrowers contend that the decision was erroneous on the merits.

Our standard of review of a trial court's decision to strike a jury trial demand is *de novo*, and our scope of review is plenary. ***See Bensinger v. University of Pittsburgh Medical Center***, 98 A.3d 672, 676-77 (Pa. Super. 2014). Under Pennsylvania Rule of Civil Procedure 208.3(a), where a trial court considers a motion, "the court may not enter an order that grants relief to the moving party unless the motion is presented as uncontested or the other parties to the proceeding are given an opportunity for an argument."

- 13 -

Pa.R.Civ.P. 208.3(a). The corresponding Northampton County Local Rule provides that a judge may consider a motion during motions court "only after a copy of the motion and the proposed order of court have been served on all counsel of record and any unrepresented party at least three . . . business days prior to the intended date of presentation." Northampton L.R. 208.3(a)(1). This Court has previously vacated a trial court's grant of a motion and remanded for further proceedings where the court failed to comply with Rule 208.3(a) or a local equivalent. *See Cove Centre, Inc. v. Westhafer Construction, Inc.*, 965 A.2d 259, 264 (Pa. Super. 2009).

"[I]n our Commonwealth, the right to a trial by jury in a civil action is fundamental to our system of law." *Mader v. Duquesne Light Co.*, 241 A.3d 600, 612 (Pa. 2020); *see also* Pa. Const. Art. I § 6. A party may waive its right to a jury trial by conduct or express statement. *See Eighth North-Val, Inc. v. William L. Parkinson, D.D.S., P.C., Pension Trust*, 773 A.2d 1248, 1256 (Pa. Super. 2001). Where a party waives its right to jury trial by contract, "there must be clear, unequivocal and decisive action of the party with knowledge of such right showing a purpose to surrender such right on his part." *Neely v. J. A. Young & Co.*, 181 A.2d 915, 917 (Pa. Super. 1962) (citation omitted); *see also Bucks Orthopaedic Surgery Associates, P.C. v. Ruth*, 925 A.2d 868, 873 (Pa. Super. 2007) (providing that contractual waiver of a right to jury trial must be knowing and voluntary).

The Borrowers assert that this Court must vacate the grant of the Bank's motion to strike the Borrowers' jury trial demand, because Judge Shenkin

violated Rule 208.3(a) and Local Rule 208.3(a)(1). Specifically, the Borrowers contend that Judge Shenkin granted the Bank's motion for reconsideration of his order, and ultimately denied their motion to strike the jury trial demand: (1) without providing any opportunity for argument as required by Rule 208.3(a); and (2) in less time than provided for presentation of the motion under the local rule.

Next, the Borrowers concede that the Loan Documents provided they would waive a demand for jury trial in the event of litigation. However, the Borrowers argue that they could not have knowingly and intelligently waived their right to a jury trial in the Loan Documents when their counsel, Judge Dally, had an irreconcilable conflict of interest based on his service as a Bank director. The Borrowers contend that Judge Dally did not advise Seitz that the Loan Documents contained provisions waiving the Borrowers' jury trial rights. The Borrowers aver that enforcing the jury trial waiver was "manifestly unjust under the circumstances" as the waiver, combined with the recusal of the entire Northampton County bench, led to a non-Northampton County jurist resolving the case. Borrowers' Brief at 28.

Upon review, we conclude that the trial court's rulings were neither procedurally defective nor erroneous on the merits. First, with respect to the Borrowers' procedural challenge to the grant of the Bank's motion for reconsideration, we observe that it is not clear whether Rule 208.3(a) and its local equivalent bound the trial court when ruling on the motion for reconsideration. Our Supreme Court has stated that a trial court "always has

the authority to reconsider its own judgment" and is "in the best position to decide if additional testimony, briefs or argument are necessary to the court in reassessing its original order." **Moore v. Moore**, 634 A.2d 163, 167 (Pa. 1993); **see also** 42 Pa.C.S.A. § 5505 (providing that a court "may modify or rescind any order within 30 days after its entry" if no appeal has been filed).

Even assuming Rule 208.3(a) and the local rule applied, and the trial court violated these rules, the Borrowers have not presented grounds to disturb the court's order granting the reconsideration motion. We have previously applied Rule 208.3(a) or a local equivalent to vacate a trial court order where the court ruled on a motion in derogation of the rules, and did not provide the non-movant adequate opportunity to respond to a motion. **See Cove Centre**, 965 A.2d at 264 (vacating trial court's grant of motion for discovery sanctions, where court did not afford non-movant opportunity for oral argument or evidentiary hearing as required by Rule 208.3 and its local analog); **see also In re Bridgeport Fire Litigation**, 5 A.3d 1250, 1259 (Pa. Super. 2010) (vacating trial court's order granting motion for compensation of claims administrator where court granted motion prior to expiration of thirty-day response deadline set forth in local rule 208.3).

Here, the reconsideration order did not deprive the Borrowers of an opportunity to respond to the Bank's arguments in its motion for reconsideration. We reiterate that when granting reconsideration, the trial court did not immediately address the merits of the jury trial waiver issue. Instead, the trial court allowed the parties to file additional memoranda of law

before making its final ruling. *See* Order, 2/12/21; *see also* Order, 4/12/21 (permitting the parties to file sur-reply briefs). Because the court provided the Borrowers with ample opportunity to address the Bank's arguments as to reconsideration, the Borrowers did not suffer prejudice based on a violation of Rule 208.3(a) or its local equivalent. Their procedural challenge thus fails.

Turning to the merits of the Bank's motion to strike the jury trial demand, we conclude that the trial court did not err by granting the motion. *See Bensinger*, 98 A.3d at 676-77. The Borrowers signed multiple Loan Documents, which contained waivers of their jury trial rights in any action or proceeding arising from the documents. For example, the Stone Gate Line of Credit Promissory Note contained the following waiver on the first page:

> ***JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.***

Exhibit D-40 at 1 (emphasis in original). The Loan Documents associated with the Bushkill Line of Credit and Stone Gate Model Home Loan contained similar jury trial waiver terms. *See, e.g.*, Exhibit D-15 at § 5(H) (Bushkill Line of Credit Commitment Letter); Exhibit D-34 at 1 (Stone Gate Model Home Loan Promissory Note). The Borrowers do not dispute that these provisions clearly and explicitly informed them that they waived their jury trial rights and that those waivers applied to the instant dispute.

None of the circumstances cited by the Borrowers compels our conclusion that the trial court erred in enforcing the jury trial waivers. Seitz

and Judge Dally were sophisticated, experienced real estate investors, who had worked with the Bank on numerous prior deals. *See* N.T., 10/17/22, at 42-45; N.T., 10/18/22, at 44. Indeed, Seitz executed, with the Bank, a loan agreement containing a similar jury trial waiver on a different project one year prior the execution of the Loans. *See* Bank's Supplemental Brief in Support of Motion to Strike Borrowers' Jury Trial Demand, 2/22/21, Exhibit 6, at 1. Furthermore, the Borrowers cite no law supporting their assertions — that either Judge Dally's role as a director at the Bank or the recusal of the Northampton County bench — nullified the jury trial waiver provisions. Therefore, no relief is due on the Borrowers' first issue.

In their second issue, the Borrowers challenge the trial court's judgment against the and in favor of the Bank. The Borrowers argue that the court erred by not finding that: (1) the parties entered into a valid restructuring agreement; (2) the Bank was equitably estopped from enforcing the Loans against the Borrowers; (3) the Bank breached the terms of the Loan Documents, excusing the Borrowers' nonperformance; and (4) the Bank breached its duty of good faith and fair dealing. We address each of these arguments in turn.

We review the Borrowers' arguments mindful of the following:

When reviewing a judgment rendered after a bench trial, we determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. We give a judge's findings of fact the same weight and effect on appeal as a jury verdict, and we consider the evidence in a light most favorable to the verdict winner. We reverse the court's factual findings only if the record

does not support them or if the court based them on an error of law. However, as to questions of law, our standard of review is *de novo*, and our scope of review is plenary.

***Wykel v. Knapp***, 288 A.3d 889, 893 (Pa. Super. 2022) (citations and quotation marks omitted).

To maintain a cause of action for breach of contract, a plaintiff must prove: (1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) resultant damages. ***See Rice Drilling B, LLC v. Scott***, 325 A.3d 663, 671 (Pa. Super. 2024). Parties form a contract when they: (1) reach a mutual understanding; (2) exchange consideration; and (3) delineate the terms of the bargain with sufficient clarity. ***See id***.

"It is . . . well settled that in order for an enforceable agreement to exist, there must be a 'meeting of the minds,' whereby both parties mutually assent to the same thing, as evidenced by an offer and its acceptance." ***United Environmental Group, Inc. v. GKK McKnight, LP***, 176 A.3d 946, 963 (Pa. Super. 2017) (citation omitted). "Absent a manifestation of an intent to be bound . . . negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." ***Gasbarre Products, Inc. v. Smith***, 270 A.3d 1209, 1218 (Pa. Super. 2022) (citation omitted).

Pursuant to the statute of frauds, an agreement to transfer an ownership interest in real property is unenforceable unless it is in writing and signed by the party granting the interest. ***See CM Goat, LLC v. Valdez***, 318 A.3d 392, 397 (Pa. Super. 2024). This Court has held that the statute of frauds applies

to agreements "to lend money to a borrower in consideration for a mortgage." ***Bozzi v. Greater Delaware Valley Savings and Loan Association***, 389 A.2d 122, 124 (Pa. Super. 1978). The statute of frauds prohibits the oral modification of an agreement that falls under its purview, unless the modification relates exclusively to the manner of performance of the agreement. ***See Hostetter v. Hoover***, 547 A.2d 1247, 1250 (Pa. Super. 1988).

An agent may bind a principal to a contract where certain criteria are present. "The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." ***Walton v. Johnson***, 66 A.3d 782, 787 (Pa. Super. 2013) (citation omitted). An agency relationship may be formed by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, or (4) agency by estoppel. ***See id***.

The Borrowers first argue that the trial court erred by not finding that the parties entered into a valid and binding restructuring agreement. They assert that the restructuring was not merely an oral agreement but was set forth in a writing, namely the Spreadsheet. The Borrowers assert that Osika bound the Bank to the restructuring agreement, based on Osika's apparent authority or under an agency by estoppel theory. The Borrowers argue that the court should have found that the Bank breached the terms of the

restructuring agreement by, *inter alia*, not disbursing the remaining funds in the Bushkill Line of Credit.

Judge Shenkin explained his ruling that the parties did not enter into a binding modification of the Loans as follows:

> One of the main points of contention between the parties is the effect of the dealings between the parties with respect to a potential restructuring of the loans. In our view, the dealings did not constitute a binding agreement as the [Borrowers] well knew. The[ Borrowers] were experienced and sophisticated developers and borrowers. They knew that any proposed restructuring of their loans required approval by a bank committee, not just a "relationship manager." Actually, the [Borrowers'] own witness[, Seitz,] testified that this loan had to be approved by the Board of Directors of the bank inasmuch as [Judge Dally] was a member of the Board of Directors of the lender.
>
> Further, there is no evidence that [the Borrowers] took any action in reliance upon the actions of the [B]ank's agents and, if they did, such reliance would not have been reasonable under the circumstances of which all parties were aware.
>
> [The Borrowers'] case is based on oral communications and the conduct of the parties. [The Bank's] case is based upon the written documents. Those written documents prevail.

Decision, 12/27/22, at 1 n.1.

In her Rule 1925(a) opinion, Judge Austin further determined that the evidence supported Judge Shenkin's finding that the parties never entered into an agreement to modify the Loans. ***See*** Trial Court Opinion, 3/26/24, at 3. Judge Austin stated that the record supported the conclusion that the Borrowers breached the Loan Documents, which warranted the Bank's declaration of a default. ***See id***. at 4. Judge Austin concluded that the statute of frauds barred any oral modification of the Loan Documents. ***See id***. at 5.

- 21 -

Based on our review, we conclude that the trial court's ruling finds support in the record and rests on a correct application of the law. *See Wykel*, 288 A.3d at 893. First, the court properly found that the statute of frauds barred any finding of a restructuring of the Loans. The Loans, as agreements to lend money secured by mortgages, fell within the statute of frauds. *See Bozzi*, 389 A.2d at 124. While the Borrowers claim that Osika reduced the restructuring agreement to writing, the Spreadsheet did not comply with statute of frauds as it did not bear the signatures of the parties and did not contain all the essential terms of a restructuring of the Loans. *See* Exhibit P-25 at 22; *see also CM Goat*, 318 A.3d at 397 (writing must be signed by parties to satisfy statute of frauds); *Conaway v. 20th Century Corp.*, 420 A.2d 405, 411 (Pa. 1980) (stating that "writings which show that the parties are still in the process of negotiation . . . do not satisfy the writing requirement of the statute of frauds").

Additionally, the Loan Documents contained provisions prohibiting oral modification of the Loans unless through a writing signed by the parties. *See, e.g.*, Exhibit D-15 at § 11 (Bushkill Line of Credit Commitment Letter); Exhibit D-33 at 4 (Stone Gate Model Home Loan Agreement); Exhibit D-39 at 4 (Stone Gate Line of Credit Loan Agreement). Where such contractual term is present, an agreement may be amended only "if the parties' conduct clearly shows the intent to waive the no-oral-modifications clause." *CM Goat*, 318 A.3d at 397. The Borrowers cite no evidence showing a clear intent by the Bank to waive the contractual bar on oral modification of the Loan Documents.

Furthermore, we determine the trial court properly rejected the Borrowers' claim that Osika had the authority to bind the Bank to the restructuring agreement. As this Court has recognized, "a third party cannot rely on the apparent authority of an agent to bind a principal if he has knowledge of the limits of the agent's authority . . . ." *Bolus v. United Penn Bank*, 525 A.2d 1215, 1222 (Pa. Super. 1987). Here, both Seitz and Judge Dally admitted at trial that Osika could not personally commit to a restructuring of the Loans, and that any proposed modification would require approval from the Senior Loan Committee. *See* N.T., 10/17/22, at 146-47; N.T., 10/18/22, at 66-67. Moreover, Seitz and Judge Dally acknowledged that Osika was still working on the restructuring plan when she left the Bank. *See* N.T., 10/17/22, at 146-47, 77; N.T., 10/18/22, at 22. Under these circumstances, the trial court properly found that Osika lacked apparent authority to act as the Bank's agent. *See* Decision, 12/27/22, at 1 n.1 (stating that the Borrowers "knew that any proposed restructuring of their loans required approval by a bank committee, not just a 'relationship manager'").

The Borrowers' agency by estoppel theory also fails. Agency by estoppel contains two elements: (1) the principal "intentionally or carelessly caused a third party to believe an agency relationship existed, or knowing that the third party held such a belief, did not take reasonable steps to clarify the facts;" and (2) the third party justifiably relied on the conduct of the principal and agent. *Walton*, 66 A.3d at 788. There was no competent evidence that the Bank caused the Borrowers to believe — or failed to dispel the Borrowers'

belief — that Osika was the Bank's agent. While the Borrowers point to the Bank's September 2016 payment of the 2014 real estate taxes, Osika succinctly explained that the Bank did so to avoid a tax-upset sale and to protect the Bank's priority mortgage lien. *See* N.T., 10/18/22, at 144. Moreover, the Loan Documents expressly provided that the Borrowers could not rely on the Bank's course of dealing in administering the Loans to establish any obligation not set forth in the Loan Documents. ***See, e.g.***, Exhibit D-18 at § 2 (Bushkill Line of Credit Note and Agreement); Exhibit D-33 at 4 (Stone Gate Model Home Loan Agreement); Exhibit D-39 at 4 (Stone Gate Line of Credit Loan Agreement).

The Borrowers also did not demonstrate justifiable reliance on the Osika's conduct, when they were aware of her limited authority at the Bank. As the trial court recognized: "[T]here is no evidence that [the Borrowers] took any action in reliance upon the actions of the [B]ank's agents and, if they did, such reliance would not have been reasonable under the circumstances of which all parties were aware." *See* Decision, 12/27/22, at 1 n.1.

The Borrowers' next sub-issue — whether the trial court erred in not applying the Borrowers' equitable estoppel defense to prevent any recovery by the Bank on their breach of contract claims — fails on similar grounds. In the absence of a contract, equitable estoppel protects a party that justifiably relies on an informal promise of another. ***See Morgan v. Millstone Resources Ltd.***, 267 A.3d 1235, 1248 (Pa. Super. 2021). "Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner

in which another was induced by word or deed to expect." ***Id***. (citation omitted). "The two essential elements of equitable estoppel are inducement and justifiable reliance on that inducement.". ***Id***. (citation omitted).

As discussed above, the record lacked evidence that the Bank induced the Borrowers to believe that it would restructure the Loans. We reiterate that Seitz admitted at trial that he was aware that Osika lacked unilateral authority to approve the restructuring agreement. Accordingly, we conclude the trial court did not abuse its discretion in finding that the Borrowers did not justifiably rely on Osika's conduct to their detriment. ***See*** Decision, 12/27/22, at 1 n.1; ***see also Patel v. Kandola Real Estate, LP***, 271 A.3d 421, 427 (Pa. Super. 2021) (stating that the issue of whether a party justifiably relies on the conduct of another is a question of fact reserved for the factfinder).

The Borrowers next argue that the Bank breached the terms of the Loan Documents. Specifically, the Borrowers assert that the Bank breached its obligations by: (1) failing to disburse the remaining available funds from the Bushkill Line of Credit; (2) referencing non-existent mortgages in the Default Letter; (3) providing only a thirteen day cure period in the Default Letter; and (4) declaring all amounts due in September 2017 without issuing a prior, conforming written notice of default and demand for payment. The Borrowers contend that the Bank's breaches both entitled the Borrowers to judgment on their breach of contract claim and excused their failure to perform under the Loans.

"When performance of a duty under a contract is due, any nonperformance is a breach." ***McCausland v. Wagner***, 78 A.3d 1093, 1101 (Pa. Super. 2013). However, only a material breach of a contract excuses performance by the non-breaching party. ***See id***. If a party breaches a contract but otherwise substantially performs, the breaching party may still enforce the contract, and the non-breaching party may not suspend performance. ***See id***.

Upon review, we conclude that the trial court properly determined that the Bank did not materially breach the Loan Documents. First, the Bank's refusal to disburse the Bushkill Line of Credit funds was not a breach, because the Borrowers were not entitled to those funds. The Bushkill Line of Credit only required disbursal for site improvement costs that the Borrowers actually incurred. ***See*** Exhibit D-15 at § 5(F) (Bushkill Line of Credit Commitment Letter). Further, the Loan Documents required that the Borrowers submit a written request, supported by bills and invoices as necessary, and accompanied by written approval by the municipal engineer. ***See id***. The Borrowers did not present any evidence that they completed any site work or sought municipal approval for additional work on the Project. Rather, the only evidence as to a request for additional funds was Seitz's testimony that he orally asked Osika for additional funds, but this did not comply with the requirement that a request be in writing. ***See*** N.T., 10/17/22, at 179.

Second, the Borrowers are correct that the April 12, 2017 Default Letter erroneously referenced defaults under the "mortgages granted by ***Stone Gate***

to" the Bank.  Exhibit D-250 at 1 (emphasis added).  While both Stone Gate Loans were secured by mortgages, ***Bushkill*** — the entity that owned the property — was the mortgagor for the Stone Gate mortgages.  ***See*** Exhibits D-35 (Stone Gate Model Home Loan Mortgage), D-41 (Stone Gate Line of Credit Mortgage).  However, this mistaken reference was not a material breach and did not harm the Borrowers.  ***See McCausland***, 78 A.3d at 1101. The Default Letter adequately informed the Borrowers of the basis for the declaration of default, and Seitz testified that he "was[ not] confused" by the reference to the Stone Gate mortgages and "knew what the[ Bank] probably meant."  N.T., 10/17/22, at 167.

Third, the Borrowers were not prejudiced by the Bank's statement in the Default Letter that the Borrowers had thirteen days (until April 25, 2017) to cure the identified issues, rather than the required fifteen days.  ***See*** Exhibit D-250 at 1; ***see also, e.g.***, Exhibit D-39 at 3 (providing that the Borrowers had right to cure any default under the Stone Gate Line of Credit within fifteen days).  Seitz admitted that the Bank did not take further action prior to the fifteenth day after the Default Letter, or indeed at any point prior to September 2017.  ***See*** N.T., 10/17/22, at 166-67.  Therefore, the miscalculation of the cure period was not a material breach of the Loan Documents and did not harm the Borrowers.  ***See McCausland***, 78 A.3d at 1101.

Finally, the Bank did not breach its obligations when it accelerated the Loans in September 2017 without making any prior demand for payment.

Contrary to the Borrowers' claim, the Loan Documents did not require that the Bank first demand partial repayment of the Loans but rather permitted the Bank to declare the full amount immediately due and payable following a default. ***See, e.g.***, Exhibit D-18 at § 9 (Bushkill Line of Credit Note and Agreement); Exhibit D-33 at 3 (Stone Gate Model Home Loan Agreement); Exhibit D-39 at 4 (Stone Gate Line of Credit Loan Agreement). Accordingly, no relief is due on the Borrowers' claim that the trial court erred by not concluding that the Bank breached its obligations under the Loans.

In their final sub-issue of their second issue, the Borrowers argue that the Bank violated its duty of good faith and fair dealing under the Loans when it declared the Borrowers in default for non-payment of real estate taxes. The Borrowers assert that the Bank knew that the Borrowers routinely paid their taxes in arrears and condoned this practice by twice paying the delinquent taxes from the Bushkill Line of Credit. The Borrowers contend that, under the circumstances, the Bank's declaration of default based on the non-payment of taxes constituted bad faith.

Parties to a contract generally have a duty of good faith and fair dealing, absent an express provision to the contrary. ***See Francis v. LCP N. Third, LLC***, 293 A.3d 273, 279 (Pa. Super. 2023). "The duty of good faith has been defined as honesty in fact in the conduct or transaction concerned." ***Id***. (citation and quotation marks omitted). However, Pennsylvania courts have refused to impose a duty of good faith and fair dealing on a lending institution that would prevent it from "adhering to its agreement with the borrower or by

enforcing its legal and contractual rights as a creditor." *Creeger Brick & Building Supply Inc. v. Mid-State Bank & Trust Co.*, 560 A.2d 151, 154 (Pa. Super. 1989); *see also Cable & Associates Insurance Agency, Inc. v. Commercial National Bank of Pennsylvania*, 875 A.2d 361, 364 (Pa. Super. 2005) (holding that, as a matter of law, lender could not violate duty of good faith by refusing to relinquish security interest in borrower's property).

Here, the Borrowers' duty of good faith and fair dealing claim relates to the Bank's demand for payment of all amounts due under the Loans following the Borrowers' default. Because a lender does not owe a duty of good faith and fair dealing when enforcing its contractual rights against a borrower, the trial court properly rejected the Borrowers' claim for relief. *See Cable & Associates*, 875 A.2d at 364; *see also Creeger*, 560 A.2d at 154. Accordingly, we conclude that each of the arguments the Borrowers presented in their second issue merit no relief.

In their third issue, the Borrowers contend that the trial court erred by not finding in their favor on their breach of fiduciary duty claim. In ascertaining whether a fiduciary relationship exists between two parties in a commercial setting, our Supreme Court has explained:

> A fiduciary duty is the highest duty implied by law. A fiduciary duty requires a party to act with the utmost good faith in furthering and advancing the other person's interests, including a duty to disclose all relevant information. This highest duty will be imposed only where the attendant conditions make it certain that a fiduciary relationship exists.
>
> In some types of relationships, a fiduciary duty exists as a matter of law. Principal and agent, trustee and cestui que trust,

attorney and client, guardian and ward, and partners are recognized examples. . . .

Where no fiduciary duty exists as a matter of law, Pennsylvania courts have nevertheless long recognized the existence of confidential relationships in circumstances where equity compels that we do so. Our courts have found fiduciary duties in circumstances where the relative position of the parties is such that the one has the power and means to take advantage of, or exercise undue influence over, the other. The circumstances in which confidential relationships have been recognized are fact specific and cannot be reduced to a particular set of facts or circumstances. . . .

The superior knowledge or expertise of a party does not impose a fiduciary duty on that party or otherwise convert an arm's-length transaction into a confidential relationship. In this regard, the analysis is no different in a consumer transaction than in other fiduciary duty cases . . . . The critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side, which results in the effective ceding of control over decision-making by the party whose property is being taken. A fiduciary duty may arise in the context of consumer transactions only if one party **cedes decision-making control to the other party**. . . . [A] business transaction may be the basis of a confidential relationship only if one party surrenders substantial control over some portion of his affairs to the other.

**Yenchi v. Ameriprise Financial, Inc.**, 161 A.3d 811, 819-20, 823 (Pa. 2017) (citations, quotation marks, brackets, and footnote omitted and emphases in original).

The Borrowers contend that the Bank's administration of the Loans created a relationship of trust and reliance between the parties. The Borrowers assert that when they requested additional financing to undertake the second phase of the Project, Osika "went beyond that request to formulate a plan . . . which was approved by the [B]orrowers and became the parties'

restructuring agreement." Borrowers' Brief at 47. The Borrowers contend that the Bank then violated the restructuring agreement — and its fiduciary duty — by issuing the default letter that denied the Borrowers the opportunity to complete the Project.

Based on our review, we discern no error by the trial court in rejecting the Borrowers' fiduciary duty claim. First, the Borrowers claim that a fiduciary relationship arose out of the alleged restructuring agreement negotiated between Seitz and Osika. As stated above, however, the discussions regarding a potential restructuring did not form a binding agreement to restructure the Loans.

Second, the evidence presented at trial undermined any claim that a confidential, fiduciary relationship existed between the parties. Seitz and Judge Dally were each experienced real estate developers who had enlisted the Bank to finance numerous prior real estate development projects. *See* N.T., 10/17/22, at 42-46; N.T., 10/18/22, at 9-12. Both Seitz and Judge Dally admitted that Seitz, rather than the Bank, retained control over the day-to-day operations of the Project. *See* N.T., 10/17/22, at 115-17; N.T., 10/18/22, at 55-56. Even if the Borrowers relied on the Bank's superior knowledge in real estate financing, there was nothing in the record showing that the Bank exerted an "overmastering influence" which led to the Borrowers "ceding [] control over decision-making" on the Project. *See Yenchi*, 161 A.3d at 823 (emphasis omitted) (customer's reliance on insurance agent's specialized skill

and knowledge when purchasing policy did not establish a fiduciary relationship).

Third, the case upon which the Borrowers principally rely, ***Busy Bee***, is non-binding on this Court. ***See Darrow v. PPL Electric Utilities Corp.***, 266 A.3d 1105, 1112 n.6 (Pa. Super. 2021) (providing that decisions of the courts of common pleas are not binding precedent). In any event, ***Busy Bee*** is readily distinguishable from the present case. In that decision, the trial court found that a lender created a fiduciary relationship with a borrower, based on the lender's involvement in the day-to-day management of the borrower's operations and its ability to compel the borrower to undertake "unusual transactions." ***Busy Bee***, 2006 WL 723487, at *26. Here, by contrast, as conceded by Seitz, the Bank did not control the Borrowers' day-to-day management. Furthermore, the Bank's demand that the Borrowers pay their delinquent real estate taxes was not an unusual transaction, but rather a mere request that the Borrowers fulfill their contractual duty under the Loans.

According, the trial court properly found that the Bank owed no fiduciary duty to the Borrowers. No relief is due on the Borrowers' third issue.

In their fourth issue, the Borrowers claim that Judge Austin's reasoning, offered in her Rule 1925(a) opinion, cannot justify Judge Shenkin's decision. The Borrowers argue that Judge Austin merely offered "speculative findings" regarding various issues, such as the applicability of the statute of frauds, where Judge Shenkin's decision did not speak to such matters. Borrowers' Brief at 49 (emphasis omitted).

Where the judge who authors the Rule 1925(a) opinion has retired or is otherwise not available, our Supreme Court has instructed:

[W]here a Rule 1925(a) opinion is deemed inadequate and the trial judge is unavailable to provide a supplemental opinion, the appellate court should review the legal issues raised in the appellant's Rule 1925(b) statement of errors complained of on appeal. As the Superior Court has noted, when deciding issues of law an appellate court is not required to defer to the conclusions of a trial court. This is consistent with the fact that for questions of law, an appellate court's standard of review is *de novo* and its scope of review is plenary. Applying this standard and scope, the Superior Court will be able to review the entire record and ultimately determine whether the trial court correctly decided the legal issues [on] appeal.

***Dolan v. Hurd Millwork Co., Inc.***, 195 A.3d 169, 176 (Pa. 2018) (internal citations omitted).

In the instant case, post-trial, Judge Shenkin authored a brief decision, explaining his reasons for ruling in favor of the Bank and against the Borrowers. After Judge Shenkin retired, Judge Austin assumed the responsibility of preparing the Rule 1925(a) opinion. Judge Austin's Rule 1925(a) opinion expanded on the discussion in Judge Shenkin's decision, and responded to the Borrowers' various claimed errors, including that the statute of frauds did not support Judge Shenkin's decision. ***See*** Trial Court Opinion, 3/26/24, at 5; ***see also*** Concise Statement, 10/4/23, at ¶ 5. Judge Austin repeatedly grounded her analysis in the trial record and Judge Shenkin's findings. ***See*** Trial Court Opinion, *3/26/24*, at 6-7 (stating, *e.g.*, that "the record shows no error" and "[t]he facts of this case fully support the verdict").

Here, after our thorough review of the record and the relevant law, we conclude that Judge Shenkin's findings of fact have support in the record, and he did not err or abuse his discretion in ruling in favor of the Bank. Furthermore, we determine that Judge Austin's Rule 1925(a) opinion adequately addresses the issues the Borrowers sought to raise on appeal, and we discern no legal error in her analysis. To the extent Judge Austin addressed legal issues not explicitly considered by Judge Shenkin, this was in response to the Borrowers' efforts to raise such issues on appeal. Therefore, we find no merit to the Borrowers' fourth issue.

In their final issue, the Borrowers challenge the award of attorneys' fees and costs to the Bank. The Borrowers note that the trial court predicated the award on Loan Documents terms which allowed the Bank to recover fees and costs following a breach of Borrowers' obligations. The Borrowers contend that because the trial court improperly awarded judgment in favor of the Bank and against the Borrowers, the award of fees and costs must also fail.

As discussed above, the trial court did not err or abuse its discretion in entering judgment in favor of the Bank on its breach of contract claims. Therefore, we also decline to disturb the trial court's award of attorneys' fees and costs to the Bank. The Borrowers' final issue merits no relief.

Having found no merit to any of the Borrowers' appellate issues, we affirm the trial court's judgment in favor of the Bank.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2025